NORTHLAND FAMILY PLANNING
CLINIC, INC., Plaintiff(s),

v.

CENTER FOR BIO–ETHICAL
REFORM, et al.,
Defendant(s).

Case No. SACV 11–731 JVS (ANx).

United States District Court,
C.D. California.

June 15, 2012.

George Gerhard Brell, Harrison J. Frahn, IV, Sara Grace Wilcox, Simpson Thacher & Bartlett LLP, Palo Alto, CA, Sarah E. Luppen, Simpson Thacher & Bartlett, Los Angeles, CA, for Plaintiff.

David E. Yerushalmi, Law Offices David E. Yerushalmi, Woodland Hills, CA, Erin Mersino, Thomas More Law Center, Robert J. Muise, American Freedom Law Center, Ann Arbor, MI, Teresa L. Mendoza, Law Office of Charles S. Limandri, APC, Rancho Santa Fe, CA, for Defendants.

## ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

JAMES V. SELNA, District Judge.

Plaintiff Northland Family Planning Clinic, Inc. ("Northland") claims that Defendants Center for Bio–Ethical Reform ("CBR"), Gregg Lee Cunningham ("Cunningham"), Donald Cooper ("Cooper"), Seth Gruber ("Gruber"), Todd Bullis ("Bullis"), Reel to Real Ministries, Inc., doing business as The Apologetics Groups ("TAG"), and Eric Holmberg ("Holmberg") (collectively, "Defendants"), infringed Northland's copyrighted video, "Every Day, Good Women Choose Abortion" (the "Northland Video"), by creating three videos that feature excerpts of the Northland Video. Defendants claim fair use. The parties have brought cross motions for summary judgment. (Defs.' Mot. Br., Docket No. 40; Pl.'s Mot. Br., Docket No. 44.) Northland seeks a partial judgment finding that Defendants infringed Northland's copyright and cannot avail themselves of the fair use defense.[1] Defendants move for summary judgment finding that certain individuals did not infringe Northland's copyright, and that any use of the Northland Video is insulated by the fair use defense. For the following reasons, Northland's Motion is DENIED and Defendants' Motion is GRANTED.

## I. Background

Northland runs family planning clinics in the greater Detroit area of Michigan. (Declaration of Sara G. Wilcox ("Wilcox Decl."), Ex. A, Deposition of Renee Chelian ("Chelian Dep.") 19:6–7, 22:22–23:2,

Docket No. 56.) Northland created the Northland Video in late 2009 to be used for outreach, counseling, and education in an effort to de-stigmatize abortion. (*Id.* at 57:20–58:7; Declaration of Rene Chelian ("Chelian Decl.") ¶ 2, Docket No. 57.) The message of the Northland Video is that abortion is not uncommon, and that women are good regardless of how they exercise their reproductive rights. (*Id.;* Notice of Filing of Exs., Chelian Dep., Ex. 8, Docket No. 50.) The Northland Video conveys that the clinic offers guidance to women who are struggling to feel good about themselves after having an abortion and women who are grappling with the decision whether to terminate their pregnancy. (Chelian Dep., Ex. 6.) Northland founder, Rene Chelian, and her employees spent significant time and creative effort writing and revising the script they used to create the Northland Video. (*See id.* at 83:2–25.) Northland registered a copyright for the Northland Video with the United States Copyright Office in 2009. (Wilcox Decl., Ex. D.) Northland posted the Northland Video on its website and on YouTube in November 2009. (First Amended Compl. ("FAC") ¶ 22.) [2]

Beginning in early 2011, Defendants made a series of videos using unaltered segments of the Northland Video without Northland's permission. TAG, acting through its director and sole employee, Eric Holmberg, created a 1 minute and 17 second video that uses several verbatim segments of the Northland Video (the "TAG Video"). (Pl.'s Notice of Lodging, Ex. F, Deposition of Eric Holmberg

---

1. Northland requests that damages be assessed at a later date. (Pl.'s Mot. Br. 1.)

2. The Court notes that the month and year during which Northland allegedly posted the Northland Video is inconsistent in the record. The FAC and Northland's motion brief state that it was posted in November 2009, while

Ms. Chelian testified that she posted it in November 2010 (Chelian Dep. 40:8–11), and Northland's Statement of Unconverted Facts ("Pl.'s SUF") states that it was posted in January 2010, (Pl.'s SUF, Docket No. 46). It is undisputed, however, that it was available on the Internet sometime before 2011.

("Holmberg Dep.") 17:19–22, 20:11–16, 37:10–25, Docket No. 77.) The TAG Video alternates between images from the Northland Video and images depicting alleged abortions. (*Id.* at Ex. 39.) The narrative from the Northland Video continues while the screen shows graphic, up-close images of the surgical procedure of dismembering and removing fetuses, many of which have discernible limbs or appear to be nearly viable. (*Id.*) The TAG Video uses the segments of the Northland Video in the same order as they appear in the original; Northland's logo and copyright mark remain as they did in the original. (*Id.*) The TAG Video closes with Northland's name, telephone number, and the words "Your Dead baby at 10 to 12 weeks," superimposed over a bloody, dismembered fetus. (*Id.*) Holmberg testified that he created the TAG Video to expose the "fallacies" of the Northland Video. (*Id.* at 39:1–8, 40:18–41:5.) He stated that he made the TAG Video "quickly," and posted it on his private YouTube channel a "few hours" after viewing the Northland Video. (*Id.*) Holmberg then emailed the link to the TAG Video on YouTube to an unknown number of persons, including Cunningham. (*Id.* at 45:3–20; Wilcox Decl., Ex. I.) The TAG Video was posted to a high-traffic anti-abortion blog called JillStanek.com, (Wilcox Decl., Ex. J), and Cunningham, the director of CBR, instructed Cooper, CBR's manager, to post the TAG Video on the CBR website with a credit to TAG, (*Id.* at Ex. K).

Then Cunningham decided to make his own video. Acting on behalf of CBR, Cunningham directed a contractor to create a video using segments from the Northland Video, the TAG Video, and clips of "the strongest abortion-in-progress shots" from other canned footage. (*Id.* at Ex. L.) Cun-ningham instructed the contractor to alternate between the Northland segments and the alleged abortion images, akin to the TAG Video. The resulting video (the "CBR I Video") opens with a Biblical citation, then alternates between segments of the Northland Video, using both its audio and visual, and the abortion footage, which is accompanied by a foreboding song called "Natural One." (*Id.*; Pl.'s Notice of Lodging, Ex. A, Deposition of Tod Bullis ("Bullis Dep."), Ex. 5.) Northland's logo and copyright remain on the CBR I Video. (Bullis Dep., Ex. 5.) On behalf of CBR and at the direction of Cunningham and Cooper, Gruber posted the CBR I Video to Bullis' website called Pro–LifeTube.com[3] on January 25, 2011. (Wilcox Decl., Ex. R, Deposition of Seth Gruber ("Gruber Dep.") 30:23–31:17.) Subsequently, Cunningham directed the contractor to add a quotation from George Orwell to the beginning of the CBR I Video, thereby creating the CBR II Video. (Wilcox Decl., Ex. S; Bullis Decl., Ex. 6.) Gruber, on behalf of CBR and at Cunningham's direction, then posted the CBR II Video on Pro–LifeTube.com. (Gruber Dep. 30:6–31:1.) Gruber also posted embedded links to the CBR II Video on the CBR website in at least three places, including a link where the Video could be downloaded. (*Id.* at 33:7–21, 92:9–16, 93:9–94:2.) The CBR Videos contain approximately 2 minutes and 22 seconds of the original 4 minute and 41 second Northland Video, or 43 percent of the original. (Wilcox Decl., Ex. U, Response to First Request for Admission No. 1.) The CBR Videos are each slightly more than four minutes long, and thus the Northland Video footage accounts for approximately half of the CBR Videos. (*Id.*) It is undisputed that no Defendants sought Northland's permission to use the North-

---

**3.** Just as it sounds, Pro–LifeTube.com is a website that hosts videos with pro-life and anti-abortion themes. (Bullis Dep. 26:14– 27:11.) Users can upload videos and watch other users' videos on the site. (*Id.* at 27:1–11.)

land Video to create the TAG or CBR Videos. (Wilcox Decl., Ex. T, Response to Second Request for Admission No. 64.)

There is some evidence suggesting that CBR uses the CBR Videos for publicity and fundraising. Gruber testified that a button labeled "Donate" in bold appears on every page on which the CBR Videos were posted; however, Gruber also noted that this button appears on the top right corner of the site regardless of which page a user views. (Gruber Dep. 88:5–25.) Cunningham testified that he sent the CBR Videos to "everyone [he] could possibly think of," and showed them at group meetings "every chance" he got, "everywhere" he went. (Pl.'s Notice of Lodging, Declaration of Gregg Lee Cunningham ("Cunningham Dep.") 133:24–134:5.) Cunningham also testified that he shows the CBR Videos "every time" he does a fundraising pitch, but Cunningham claims he does not remember whether he used the CBR Videos in his pitches prior to this lawsuit. (*Id.* at 156:7–8, 157:14–18.) He also explained that he shows the CBR Videos at fundraisers because the CBR Videos are "part of what we are doing," and CBR's "entire existence hangs on the goodwill of donors who want to know what we're doing and want to know what our challenges and burdens are . . . ." (*Id.* at 156:18–21.)

Northland's counsel sent letters on March 18, 2011 to Bullis as the owner of Pro–LifeTube.com, and to Cunningham and Cooper as director and manager of CBR, respectively, informing them that the CBR Videos infringe Northland's copy-right and demanding that the CBR Videos be removed from their websites.[4] (Wilcox Decl., Exs. W, X.) Bullis did not respond. (Bullis Dep. 37:13–38:25.) CBR replied through counsel refusing to remove the CBR Videos. (Wilcox Decl., Ex. Z.)

Northland contemplated licensing the Northland Video to other clinics, and Chelian had spoken with individuals in other facilities about their potential use of the material. (Chelian Dep. 38:24–40:3; Chelian Decl. ¶ 5; Declaration of E. Barnes ("Barnes Decl.") ¶ 5, Docket No. 69.) However, once prospective licensees such as Ms. Barnes became aware of the CBR and TAG Videos, they were no longer interested in using the Northland Video. (Barnes Decl. ¶¶ 7–9.) Ms. Chelian also determined that she could no longer use the Northland Video at speaking engagements and seminars in light of the TAG and CBR Videos. (Chelian Decl. ¶ 6.)

Northland filed this action against Defendants on May 12, 2011, alleging Defendants' conduct violated Northland's exclusive right to use of the Northland Video pursuant to 17 U.S.C. § 106. (Compl., Docket No. 1.) Northland filed its FAC on November 29, 2011. Both parties have moved for summary judgment regarding the applicability of the fair use defense to Defendants' conduct.

II. Legal Standard

Summary judgment is appropriate when the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[5]

---

4. Northland's counsel sent these notices pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, which provides that a "service provider," such as Pro–Life-Tube.com and the CBR website, is not liable for copyright infringement for material posted on its website by others so long as it promptly removes the material upon receiving a notification of infringement from the copyright holder. 17 U.S.C. § 512(c).

5. After reviewing the pleadings in the cross motions, the Court invited each party to submit a supplemental brief of no more than five pages addressing whether the Court could decide this case as a matter of law on the present factual record. (Docket No. 83.) Both parties submitted briefs answering affirmatively. (Defs.' Supp. Br., Docket No. 84; Pl.'s Supp. Br., Docket No. 85.)

Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by referring to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

The moving party has the initial burden of establishing the absence of a material fact for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. If the moving party satisfies its initial burden, the nonmoving party "may not rest upon the mere allegations or denials" of the moving party's pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Furthermore, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, if the nonmoving party does not make a sufficient showing to establish the elements of its claims, the Court must grant the moving party's motion.

Where the parties have made cross-motions for summary judgment, as they have in this case, the Court must consider each motion on its own merits. *Fair Hous. Council v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. *See id.* at 1137.

"In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56–3.

III. Discussion

**A. Copyright Infringement**

■ To prevail on a claim of copyright infringement, Plaintiffs must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Here, the parties do not dispute that Northland owns a valid copyright to the Northland Video. Nor do they dispute that the TAG and CBR Videos copy substantial portions of the Northland Video. The parties dispute only whether the Defendants' use of the Northland Video constitutes fair use.

**B. Fair Use**

■ Fair use is an exception to a copyright holder's right to exclusive use of the original work and its derivatives. 17 U.S.C. § 107. It is "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting H. Ball, *Law of Copyright & Literary Property* 260 (1944)). The privilege results from an understanding that some limited use of copyrighted material is necessary to allow artists and authors to improve upon, comment on, or criticize prior works. *See id.; Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Fair use reflects the goals of the Copy-

right Act "to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799 (9th Cir.2003).

■ Section 107 of the Copyright Act codified the common law framework for identifying fair use:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> > (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> >
> > (2) the nature of the copyrighted work;
> >
> > (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> >
> > (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The analysis "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 577, 114 S.Ct. 1164 (quoting *Stewart v. Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990)) (alterations omitted). The factors are not winner-take-all categories to be tallied at the end to determine the prevailing party; they are intended to be carefully weighed case by case with an eye towards the policies underlying copyright protection. *See id.* "Nor may the four statutory factors be treated in isolation one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.; accord Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc. ("Seuss II")*, 109 F.3d 1394, 1399 (9th Cir.1997).

■ Application of the fair use doctrine is a mixed question of law and fact. *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218. Thus, where the material facts are not subject to dispute, summary judgment on the fair use question is proper. *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir.1986). Because fair use is an affirmative defense to copyright infringement, the defendant bears the burden of proving fair use. *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164; *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir.2007).

With this background in mind, the Court considers the four statutory factors individually.

### 1. Purpose and Character of the Use

■ Under the first factor, the "purpose and character of the use," the Court considers the extent to which the new work is "transformative." *Mattel*, 353 F.3d at 800. The new work is "transformative" if it adds "something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* (quoting *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164); *Seuss II*, 109 F.3d at 1400. While transformative use is not "absolutely necessary" for a finding of fair use, transformative works advance the goals of copyright law, and thus they are at the "heart of the fair use doctrine's breathing space within the confines of copyright." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. Examples of fair use include social commentary, criticism, and news reporting. *Id.* at 578, 114 S.Ct. 1164. The Court also considers whether the new work is for commercial or non-commercial use. *Id.* at 580, 114 S.Ct. 1164. Typically, a work created for commercial use is less likely to bear fair use protection; however, the commercial/non-commercial distinction is less significant the more transformative the work is. *Id.*

Defendants' primary argument is that the TAG and CBR Videos are parodies of the Northland Video, intended to criticize, comment on, and disparage the narrator's calm manner as well as her message that good women choose to terminate their pregnancy and that abortion is "normal."

 Parody has transformative value protected under Section 107 because it can provide social benefit by commenting on the original work, and in the process, create a new one. *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164; *see Seuss II*, 109 F.3d at 1400 ("Parody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment."). A parody employs elements of a prior work to create a new work that, at least in part, comments on the original. *Campbell*, 510 U.S. at 580, 114 S.Ct. 1164. The difference between parody and satire is that in the former the copyrighted work is "the target" and in the latter it is "merely a vehicle to poke fun at another target." *Seuss II*, 109 F.3d at 1400 (citing *Campbell*, 510 U.S. at 580, 114 S.Ct. 1164). "The parody must target the original, and not just its general style, the genre of art to which it belongs, or society as a whole (although if it targets the original, it may target those features as well)." *Campbell*, 510 U.S. at 597, 114 S.Ct. 1164 (Kennedy, J., concurring); *see Mattel*, 353 F.3d at 801. In *Campbell*, for example, the Supreme Court determined that music group 2 Live Crew's rap song "Pretty Woman" was a parody of the Roy Orbison rock ballad "Oh, Pretty Woman" because the former was, at least in part, commenting on the latter. 510 U.S. at 580–81, 114 S.Ct. 1164. The 2 Live Crew version "reasonably could be perceived as commenting on the original or criticizing it, to some degree" because "2 Live Crew juxtaposes the romantic musings of a man whose fantasy comes true, with degrading taunts, a bawdy demand for sex, and a sigh of relief from paternal responsibility." *Id.* at 583, 114 S.Ct. 1164; *cf. Seuss II*, 109 F.3d at 1401 (finding the accused work was not a parody because it broadly mimicked Dr. Seuss' characteristic style, but did not hold his style to ridicule).

The *Campbell* parody rule has been applied across all artistic media. For example, the use of a well-known Annie Leibovitz photograph of Demi Moore posing naked and pregnant was found to be fair in an advertisement for a movie called "Naked Gun 33 1/3: The Final Cut," where the alleged infringer replaced Ms. Moore's head with the "smirking" face of Leslie Nielsen. *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998). The second work was a parody because a viewer could reasonably perceive it as a comment on the "undue self-importance" conveyed by the subject of the first work. *Id.* In *Mattel*, artist Thomas Forsythe turned the image of Barbie as the "ideal American woman" on its head with photographs portraying a nude Barbie in danger of being attacked by vintage household appliances. 353 F.3d at 801. While the true Barbie displays unwavering poise and glamor, Forsythe's creations are disheveled, sexualized, occasionally dismembered, and in imminent danger of attack by the domestic items her very persona conjures. *Id.* at 802. Forsythe's creations are parodies because his social commentary is pointed at Mattel's Barbie and the role of Barbie in influencing women's position in society.

By contrast, when the original work is incidental to the alleged infringer's comment on a broader topic, the work is "better characterized" as a satire. *Blanch v. Koons*, 467 F.3d 244, 247 (2d Cir.2006). In *Blanch*, the alleged infringer, "appropriation artist" Jeff Koons, cut out part of a fashion photograph ("Silk Sandals") depicting the legs of a model wearing sandals,

and repositioned the image in a landscape of legs surrounded by abundantly glazed confections. The final product is a comment on mass imagery, consumerism, overindulgence, and desire. The court found that Koons' work was "better characterized" as a satire, rather than a parody, because "its message appears to target the genre of which 'Silk Sandals' is typical, rather than the individual photograph itself." *Blanch,* 467 F.3d at 254.

 Parody is afforded more leeway than satire under the fair use doctrine because parody necessarily requires the parodist to mimic the original to make its point, while satire "can stand on its own two feet," and thus requires further justification for its borrowing. *Campbell,* 510 U.S. at 580, 114 S.Ct. 1164. If the alleged infringer merely uses the original to "get attention or avoid the drudgery in working up something fresh," the borrower's fairness claim diminishes or even vanishes, depending on the balance of the remaining factors. *Id.*

In this case, the TAG and CBR Videos are parodies of the Northland Video because they use segments of the Northland Video in alternation with macabre images of abortion procedures to deride the original work's message that abortion is "normal" and that good women choose to terminate their pregnancy. Akin to Barbie's metamorphosis in *Mattel* as commentary on gender roles, here, Defendants turn the Northland Video's message "on its head" by alternating clips of the calm, empathetic doctor explaining that choosing to have an abortion does not make you a bad woman, with shockingly graphic images of fetuses being dismembered and removed from the birth canal. For example, in the beginning of the accused Videos, a clip from the Northland Video plays in which the narrator says, "deciding to have an abortion is a normal decision"; then, the screen cuts to a video clip in which it appears that a fetal

hand reaches out of the birth canal and gloved fingers—ostensibly those of a doctor—expose more of the hand before using forceps to rip off the appendage. Of course, Defendants' abundantly clear message is that deciding to have an abortion is anything but a "normal decision" made by "good women." The accused Videos continue in that vein, contrasting the serene environment of the narrator's office, her soft, conservative attire, her calm voice, and her message that women are good regardless of how they exercise their reproductive rights, with the gruesome and seemingly savage "reality" of an abortion procedure.

Northland contends that the accused Videos are not parodies because they use verbatim segments of the Northland Video to represent a viewpoint consistent with Northland's message in a "debate" regarding the broader "good women" theme. (Pl.'s Mot. Br. 14–15.) In other words, the Northland clips merely serve as a placeholder for the pro-choice perspective in a reproductive rights debate portrayed in the accused Videos. Northland points to the tag for the CBR Videos as evidence that the Video was intended to be a "debate": "The Most Shocking (Graphic Imagery), Four–Minute Abortion Debate You Will Ever See." Northland likens this case to *Henley v. DeVore,* 733 F.Supp.2d 1144 (C.D.Cal.2010), asserting that in both cases the defendants "borrow[ed] heavily from the creative aspects" of the original works to make new works on "different subjects." (Pl.'s Mot. Br. 15 (citing *Henley,* 733 F.Supp.2d at 1158)). Here, the "new work"—the accused Videos—are on a "different subject" because they speak broadly about the abortion "debate" and not about the Northland Video specifically.

However, while the CBR Videos may be coined "debates," it is clear from watching them that Defendants were not attempting to present "both sides" of the issue. The

Northland segments do not convey the pro-choice perspective; rather, they are presented for the sake of being sharply criticized. Moreover, unlike *Henley,* in which the defendants "evoked the same themes" as the two original songs from which it borrowed "to attack an entirely separate subject," here, Defendants copied the Northland Video for the primary, if not exclusive, purpose of attacking it. While the accused Videos may comment globally on the abortion debate, they are primarily focused on criticizing elements of the Northland Video.[6] Indeed, before this lawsuit was filed, communication between the Defendants shows that the purpose of the Videos was to dispel the "falsities" of the Northland Video, and to create a "parody" contrasting the "soothing lies of the narrator ... and the terrible truths of the abortion." (Wilcox Decl., Ex. K.) Thus, the criticism is targeted at the copyrighted work specifically, not just the pro-choice position. The CBR Videos even suggest that the Northland narrator is Satan, as both CBR Videos are entitled "Angel of Light" and display a quotation from the Biblical verse Corinthians 11:14, which states, "And no wonder, for Satan himself masquerades as an angel of light," before cutting to the narrator. In sum, there is no question of fact that the accused Videos use the original to comment on and criticize that work specifically, and in the process, create a new work.

 Northland also argues that the accused Videos are not parodies because they are not "humorous mimicries" of the Northland Video. (Pl.'s Mot. Br. 13.) Indeed, Defendants do not dispute that the accused Videos are humorless. (Defs.' Opp'n Br. 14–15, Docket No. 73.) However, during the hearing, Northland overstated the importance of comedy in parody analysis. Northland quoted *Campbell* in arguing that parody involves imitation of a previous work for "comic effect or ridicule," but these selected quotations have little, if any, legal effect, as the Court stated:

> The germ of parody lies in the definition of the Greek *parodeia,* quoted in Judge Nelson's Court of Appeals dissent, as 'a song sung alongside another.' Modern dictionaries accordingly describe a parody as a literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule, or as a 'composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous.' *For purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.*

510 U.S. at 580, 114 S.Ct. 1164 (internal citations omitted) (emphasis supplied). Thus, the "heart" of a parody defense is the use of elements of the prior composition to create a new work that comments on or criticizes the original. *Id.* Moreover, even under the dictionary definition of parody quoted in *Campbell,* a parody is not necessarily humorous: it imitates a prior work for "comic effect *or* ridicule." [7] *Id.*

---

**6.** A parody that "more loosely targets an original" than the parody presented in *Campbell* "may still be sufficiently aimed at an original work to come within [the Court's] analysis of parody." *Campbell,* 510 U.S. at 581, 114 S.Ct. 1164; *see also MCA, Inc. v. Wilson,* 677 F.2d 180, 185 (2d Cir.1981) (holding that "a permissible parody need not be directed sole-

ly to the copyrighted song but may also reflect on life in general"). Thus, even if this Court found that the accused Videos broadly criticized the pro-choice position in addition to the Northland Video, the analysis would be in accord with *Campbell.*

**7.** At least one circuit court construing *Campbell* has held that parody is commentary or

(emphasis supplied.) Accordingly, for purposes of copyright law, humor is not a necessary element of parody. Here, the accused Videos fall squarely within the *Campbell* definition of parody because there is no doubt that a viewer could, and most likely would, reasonably perceive the accused Videos to be highly critical commentary on the original, aimed at ridiculing it.

Finally, Northland argued at the hearing that the accused Videos are not parodies because they criticize a work that is not well known to the public. Northland cited language in *Campbell* to argue that the object of a parody is always a well-known work: "Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin." *Campbell*, 510 U.S. at 588–89, 114 S.Ct. 1164. However, as quoted *supra*, the *Campbell* Court carefully defined parody "for purposes of copyright law," and nowhere in that definition did the Court limit the parodist's target to well-known works. While the *Campbell* Court noted in dicta that "parodies almost invariably copy publicly known, expressive works," the Court did not find that parodies always, or by definition, copy publicly-known works. *Id.* at 586, 114 S.Ct. 1164. Furthermore, the *Campbell* Court had no occasion to discuss parodies of obscure works because the target of the parody in *Campbell* was the highly popular song "Oh, Pretty Woman."

At least two courts applying *Campbell* to parodies of lesser known or obscure works have found that those parodies warranted fair use protection. In one case, a comedian sued for copyright infringement alleging that popular mock news program "The Daily Show" ("Daily Show") used a clip from her public access television program, "The Sandy Kane Blew Comedy Show" ("Kane Show"), without her authorization. *Kane v. Comedy Partners*, 68 U.S.P.Q.2d (BNA) 1748, 2003 WL

---

criticism that requires neither "comic effect" nor "ridicule." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1268–69 (11th Cir.2001). The Eleventh Circuit reasoned:

> The Supreme Court's definition of parody in *Campbell*, however, is somewhat vague. On the one hand, the Court suggests that the aim of parody is 'comic effect or ridicule,' but it then proceeds to discuss parody more expansively in terms of its 'commentary' on the original. In light of the admonition in *Campbell* that courts should not judge the quality of the work or the success of the attempted humor in discerning its parodic character, we choose to take the broader view. For purposes of our fair-use analysis, we will treat a work as a parody if it aims to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to scholarly or journalistic, work.

*Id.* (internal citations omitted). Arguably, however, the work at issue in *Suntrust Bank* did, in fact, ridicule or attempt to ridicule the original work. In that case, the court confronted humorless parody in a book that drew upon the characters and story line from "Gone with the Wind" to critique the original work and the depiction of slavery in the Civil–War–era American South. *Id.* at 1259. The court held that the accused work was a parody because it imitated the original to make a "specific criticism of and rejoinder to the depiction of slavery and the relationship between blacks and whites in ['Gone with the Wind']." *Id.* at 1269. While the court did not mention ridicule in its parody analysis, the work likely could have been reasonably perceived as ridiculing "Gone with the Wind," and thus it was probably a parody even under a narrower construction of *Campbell*. In this case, the Court need not decide whether "comic effect or ridicule" is a necessary part of parody because the accused Videos are undoubtedly aimed at ridiculing the Northland Video. As admonished in *Campbell* and *Suntrust Bank*, the Court does not evaluate the success of the ridicule, but looks only at the aim of the work and a reasonable perception of the work. Accordingly, the accused Videos fall within both the broader and narrower constructions of "parody."

22383387, at *1, 2003 U.S. Dist. LEXIS 18513, at *1 (S.D.N.Y. Oct. 15, 2003), aff'd, 98 Fed.Appx. 73 (2d Cir.2004). The Daily Show segment opens with a full-screen image from the Kane Show, showing the plaintiff dancing in a bikini. *Id.* at *1, 2003 U.S. Dist. LEXIS 18513 at *3. The Kane Show logo appears in the clip as it did in the original. *Id.* The full-screen image remains on the screen for less than a second then shrinks to the lower corner, and three other clips appear to form a video collage. Throughout this introduction, the title "Public Excess" flashes across the screen, accompanied by music. *Id.* The "Public Excess" segment mocks the public access programs sampled in the video collage by "presenting and commenting on clips of those shows," in the characteristic format of the Daily Show. *Id.* at *1–2, *3–4, 2003 U.S. Dist. LEXIS 18513 at *4, *10. The accused work was unlike those in traditional parody cases in that "the use of plaintiff's clip ... did not involve an altered imitation of a famous work but the presentation of *an obscure,* original work in a mocking context." *Id.* at *4, 2003 U.S. Dist. LEXIS 18513 at *10 (emphasis supplied). However, because the accused work used excerpts of the original work to ridicule it, parody analysis applied. The court reasoned, "[t]he only significance of deeming a work a parody is the concomitant determination that the work contains elements of commentary and criticism." *Id.* at *4, 2003 U.S. Dist. LEXIS 18513 at *11 (citing *Campbell,* 510 U.S. at 580, 114 S.Ct. 1164). Thus, "the important, if not dispositive, issue is whether [the] use of plaintiff's material amounted to comment or criticism." *Id.* Because the accused work ridiculed the original by using plaintiff's clip in a segment called "Public Excess" and adding derisive commentary, defendants "unquestionably used her material for the purpose of criticism." *Id.*

In this case, akin to *Kane,* the target of the parody is not a publicly-known work. While the Northland Video may be fairly well known in the family planning and counseling community, (*see, e.g.,* Expert Report of Ruth Arick ("Arick Rep.") ¶¶ 22, 25, Docket No. 86), it is not a universal popular culture reference like "Oh, Pretty Woman," Dr. Seuss, or Barbie. Like the "obscure" television show in *Kane,* the Northland Video has a limited viewership. However, just as in *Kane,* where an audience unfamiliar with the Kane Show could still appreciate the parody in the Daily Show segment, here, a viewer unfamiliar with the Northland Video could nonetheless recognize that the accused Videos were meant to ridicule the original. While the Daily Show segment criticized the Kane Show by adding commentary and showing clips from the original set to music with the pun title "Public Excess," here, the accused Videos derided the original by adding images, Biblical citations, and music intended to contradict and ridicule the message of the Northland Video. In both cases, the defendants used portions of the original to "critically examine" it. 2003 WL 22383387, at *4–5, 2003 U.S. Dist. LEXIS 18513, at *12–13.

Similarly, in *Rycraft, Incorporated v. Ribble Corporation,* No. 97–1573–KI, 1999 WL 375610, at *8–12, 1999 U.S. Dist. LEXIS 6052, at *24–31 (D.Or. Apr. 26, 1999), a parody of a little-known work was entitled to fair use protection. In that case, Ribble, a cookie stamp manufacturer, copied the designs, themes, and configurations of the cookie stamps produced by its main competitor, Rycraft. *Id.* at *2, 1999 U.S. Dist. LEXIS 6052 at *5. Ribble also copied Rycraft's marketing materials, creating a sell sheet that displayed 48 of its designs in a grid pattern and sequence substantially similar to Rycraft's "Top 40 list." *Id.* at *3, 1999 U.S. Dist. LEXIS 6052 at *9. Of the 48 Ribble cookie stamps, 41 were substantially similar in design and

theme as the Rycraft products. *Id.* Criticizing Ribble's tactics, Rycraft created a flyer imitating Ribble's sell sheet. For each of the cookie stamps Ribble had copied, Rycraft placed an image of the Ribble stamp with the name of the corresponding Rycraft cookie stamp below the image. The top of the flyer read, "Has another company shown you our designs lately? Well, here are the originals—Robin Rycraft's designs most of which appeared on a Top 40 List we published for you." *Id.* at *3–4, 1999 U.S. Dist. LEXIS 6052 at *10. Rycraft conceded that it did not know whether the customers to whom it sent flyers had seen the Ribble sell sheet, and thus the object of the parody was not necessarily well-known by its anticipated audience. *Id.* at *4, 1999 U.S. Dist. LEXIS 6052 at *11. Nevertheless, the flyer was a protected parody because it used elements of the original to criticize Ribble for copying Rycraft's product line. *See id.* at *3–4, *9, 1999 U.S. Dist. LEXIS 6052 at *10, *26. Thus, the court implicitly held that the object of a parody need not be a well-known work.

■ This Court agrees with the *Kane* and *Rycraft* courts that fair use protection is not limited to parodies of well-known works. Parody promotes the creativity copyright law is designed to foster whether the parodied work is a household name or completely unknown. The benefit of social commentary and criticism is not confined to works indicting the former. Just as the *Campbell* decision cautioned courts against evaluating a parody's success, so too should courts refrain from evaluating the popularity of the parodist's target. *Campbell,* 510 U.S. at 582, 114 S.Ct. 1164

(quoting *Yankee Publ'g v. News Am. Publ'g, Inc.,* 809 F.Supp. 267, 280 (S.D.N.Y.1992) (Leval, J.) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.")). Indeed, courts have no business circumscribing the parodist's victim.

In sum, the Court finds that the accused Videos are parodies of the Northland Video.

■ Northland further asserts that even if the accused Videos are parodies, they are not sufficiently transformative to warrant fair use protection. (Pl.'s Mot. Br. 13–15.) Finding parody, alone, does not automatically trigger fair use protection. *See Campbell,* 510 U.S. at 579–81, 114 S.Ct. 1164 (finding that "parody may or may not be fair use"); *Fisher,* 794 F.2d at 434 n. 2. To be transformative, "[t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work." *Worldwide Church of God v. Phila. Church of God, Inc.,* 227 F.3d 1110 (9th Cir.2000) (quoting *Folsom v. Marsh,* 9 F.Cas. 342, 345 (C.C.D.Mass.1841)).

■ Northland contends that Defendants' use of the Northland Video was not sufficiently transformative because they used substantial verbatim sections of the original and did little to alter the work as a whole. Further, Northland argues that this case is distinguishable from other parody cases in that the defendants in *Mattel*[8] and *Campbell*[9] mimicked or manipulated

---

**8.** In *Mattel,* Forsythe used entire Barbie dolls and dismembered parts, but incorporated them in the vignettes he created such that a new work emerged "imbued with a different character." 353 F.3d at 804. Forsythe's "lighting, background, props, and camera angles all serve to create a context for Mattel's

copyrighted work that transform Barbie's meaning." *Id.* at 802.

**9.** In *Campbell,* 2 Live Crew took the most recognizable part of "Pretty Woman," but it added "scraper" noises and overlays to the music and changed the lyrics, thereby trans-

the original work to create their parodies, whereas here, Defendants used segments of the original work verbatim and merely spliced it with other footage to form the new work. Therefore, Northland asserts, Defendants' use was not sufficiently transformative to justify the substantial use of verbatim clips from the Northland Video. While courts have not addressed verbatim use of copyrighted video content in the parody branch of the fair use doctrine, it is well established that "wholesale copying does not preclude fair use per se." *A & M Records Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir.2001) (quoting *Worldwide Church*, 227 F.3d at 1118). Under "certain circumstances," a use is fair even when the protected work is copied in its entirety. *Id.; see, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449–50, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (acknowledging that fair use of time-shifting necessarily involved making a full copy of a protected work), *superceded on others grounds by statute as stated in Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F.Supp.2d 913 (N.D.Cal.2009); *Mattel*, 353 F.3d at 803 n. 8 (noting that the Ninth Circuit has held that "entire verbatim reproductions are justifiable where the purpose of the work differs from the original"); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir.2006) (finding that use of reproductions of Grateful Dead concert posters in a biography of the band was fair use because they were "historical artifacts" within context of the biography and thus had a transformative use).

The "certain circumstances" of this case justified Defendants' verbatim copying of Northland's work, given the difficulties of parodying a generally unfamiliar video. First, Defendants had to make a full copy of the Northland Video in order to distill it into the segments they would need to create their own videos. Second, Defendants' verbatim use of segments of the original work was necessary to create the parody because the Northland Video is not a highly recognizable work ingrained in the collective psyche of Defendants' audience. Unlike "Pretty Woman" or Barbie, where a parodist can comment on the original with a broadly suggestive allusion, here, Defendants could not effectively comment on the Northland Video without showing verbatim excerpts that captured the essence of the message and the mannerisms of the narrator.[10] While the transformation of the Northland Video may have been more rudimentary[11] than the transformation of the song lyrics

forming it. 510 U.S. at 589, 114 S.Ct. 1164. Thus, that case was not a situation where "a substantial portion" of the parody itself was composed of a "verbatim" copying of the original. *Id.; see also Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F.Supp.2d 84, 89 (S.D.N.Y.2003) (finding fair use of the song "What a Wonderful World" in rapper Ghostface Killah's sarcastic song "The Forest," which used the same melody and imitated the lyrics of the original to portray a corrupt and venal world, thereby ridiculing the "unrealistically uplifting" message of the original).

10. This argument is closely related to the "amount and substantiality of use" analysis, discussed *infra* section B.3.

11. In the TAG Video, Defendants alternate between clips from the Northland Video and footage of alleged abortions. The narrative from the Northland Video continues throughout the TAG Video. The CBR I Video is slightly more transformed in that Defendants added their own music to accompany the images of the alleged abortions, and the Video begins with a Biblical quotation. The CBR II Video is the most transformed, adding a George Orwell quotation to the beginning of the CBR I Video. The Court finds that each of the accused Videos is sufficiently transformative because they edit the original and add content in such a way that dramatically changes the meaning of the work, thereby creating a new work that comments on the original.

in *Campbell* or the photographs of Barbie in *Mattel,* Defendants fundamentally changed and commented on the copyrighted work.[12] *Compare Mattel,* 353 F.3d at 800, *with Religious Tech. Ctr. v. Netcom On–Line Commc'n Servs., Inc.,* 923 F.Supp. 1231, 1243 (N.D.Cal.1995) (finding that the defendant's use of copyrighted Scientology materials was not transformative because, despite his purported purpose of criticizing the Church, he republished the original work with little or no added commentary or criticism). The new background soundtrack, the visuals, and the juxtaposition of the new video clips with the original creates an entirely different impact on the viewer. Thus, the accused Videos are transformative.

 The "purpose" factor also requires the Court to consider whether the defendant's use is commercial or noncommercial. *See* 17 U.S.C. § 107; *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Id.* In determining whether the purpose for the infringing work was "profit," "monetary gain is not the sole criterion ... particularly in [a] ... setting [where] profit is ill-measured in dollars." *Worldwide Church,* 227 F.3d at 1117 (alteration in original) (quoting *Weissmann v. Freeman,* 868 F.2d 1313, 1324 (2d Cir.1989) (holding that a professor's verbatim copying of an academic work was not fair use, in part because a professor can "profit" by gaining recognition among his peers and authorship credit)). In *Worldwide Church,* the Ninth Circuit concluded that the Philadelphia Church of God "unquestionably" profited from the use of Worldwide Church of God's publication because it provided them with their core text essential to its members' religious observance, thereby enabling the ministry to grow. 227 F.3d at 1118.

In this case, Defendants at least in part profited from the creation and dissemination of the accused Videos. First, it is undisputed that Cunningham used the CBR Videos for fundraising and spreading CBR's message. Cunningham testified that he shows the CBR Videos "every time" he does a fundraising pitch because the CBR Videos are "part of what we are doing," and CBR's "entire existence hangs on the goodwill of donors who want to know what we're doing and want to know what our challenges and burdens are...." (Cunningham Dep. 133:24–134:5, 156:18–21.) Defendants argue that this fact is immaterial because Cunningham declared that any request for donations "remotely related" to the accused Videos were made after Northland filed this suit for the sole purpose of defraying litigation costs. (Defs.' Opp'n to Pl.'s MSJ 16 (citing Cunningham Decl. ¶ 11).) However, Cunningham's Declaration is inconsistent with his deposition testimony, in which he stated that he could not remember whether he used the CBR Videos in his pitches prior to this lawsuit. (Cunningham Dep. 156:7–8, 157:14–18.) Moreover, Defendants have cited no authority for their position that using an accused work to solicit donations for a litigation defense of that work is exempted commercial activity.[13]

12. Further, "[w]hether the parody is in good taste or bad, fails or succeeds," is inconsequential in the fair use analysis. *Campbell,* 510 U.S. at 582–83, 114 S.Ct. 1164.

13. Defendants cite *Righthaven, LLC v. Jama,* No. 2:10–CV–1322 JCM (LRL), 2011 WL 1541613, at *2–3, 2011 U.S. Dist. LEXIS 43952, at *7–8 (D.Nev. Apr. 22, 2011), for the proposition that the solicitation of donations on a non-profit organization's website is immaterial to the commercial use analysis. (Defs.' Opp'n to Pl.'s MSJ 16.) However, that case does not hold that fundraising for a litigation defense of the accused work is protected under copyright law. The Court finds no reason to draw a distinction between pre-

Second, even if Defendants did not use these videos directly for fundraising, the Videos generated traffic to the anti-abortion websites on which they were posted and incited discussion on the sites' message boards. Defendants appropriated the copyrighted material to advance their own message, and therefore derived a benefit from their use. Generating traffic to one's website or conveying one's message effectively using copyrighted material is within the type of "profit" contemplated by *Worldwide Church.* Moreover, that users on the CBR website could make donations through a link on the same page where the Videos were posted is further evidence that the Defendants profited from the Videos. *Henley,* 733 F.Supp.2d at 1159. *But see Righthaven, LLC v. Jama,* No. 2:10–CV–1322 JCM (LRL), 2011 WL 1541613, at *2–3, 2011 U.S. Dist. LEXIS 43952, at *7–8 (finding it immaterial in the commercial use analysis that a defendant non-profit organization solicited donations on its website where the accused material was posted).

However, as noted earlier, the commercial aspects of the accused work are less important when the work is significantly transformative. *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. Indeed, "even works involving comment and criticism 'are generally conducted for profit in this country.'" *Mattel,* 353 F.3d at 803 (quoting *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164). Here, Defendants used Northland's work to criticize it-not to "exploit its creative virtues." *Blanch,* 467 F.3d at 257. On balance, the profit Defendants gained from the use of Northland's copyrighted material is a minor part of the analysis in light of the transformative use of the material.

### 2. Nature of Copyrighted Work

█ The second statutory factor, "the nature of the copyrighted work," acknowl-

edges that creative works are "closer to the core of intended copyright protection" than informational and functional works, "with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. However, this factor is not "terribly significant in the overall fair use balancing," *Seuss II,* 109 F.3d at 1401, particularly in the parody context where a creative work is frequently the nub of the parodist's comment or criticism, *see Campbell,* 510 U.S. at 586, 114 S.Ct. 1164 (finding the second factor unlikely to "help in separating the fair use sheep from the infringing goats in a parody case").

The copyrighted work in this case is informational, functional, and creative. Northland made creative choices in writing the script and staging the narrator in its Video. The Video is also informational and functional because it promotes the guidance program at Northland and spreads Northland's "good women" message. The artistic decisions Northland made in articulating its message, staging the scene, and adding inspirational quotes and calming music makes this work "closer to the core of intended copyright protection" than purely informational or functional works. Accordingly, this factor weighs slightly in favor of Northland.

### 3. Amount and Substantiality of Portion Used

█ In the parody context, the third factor turns on "the persuasiveness of a parodist's justification for the particular copying done, ... [;] the extent of permissible copying varies with the purpose and character of the use." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. The analysis of this factor will "also tend to address the fourth, by revealing the degree to which the parody may serve as a market substitute for

and post-litigation commercial use of infring- ing works.

980

the original or potentially licensed derivatives." *Id.* at 587, 114 S.Ct. 1164.

Parodies have more leeway under the third factor because a parody must take recognizable material from the original in order to convey its message. *Campbell,* 510 U.S. at 588–89, 114 S.Ct. 1164. Moreover, to be recognizable, the parodist generally must extract the "heart" of the original. *Id.* (noting that "[i]t would be difficult to see how the transformed work's parodic character would have come through if it did not copy the core of the original"). There is, of course, a limitation on the amount and substantiality of the original the parodist may use:

> Once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original.

*Id.* at 587, 114 S.Ct. 1164. The Ninth Circuit has adopted the "conjure up" test: "The parodist is permitted a fair use of a copyrighted work if it takes no more than is necessary to 'recall' or 'conjure up' the object of his parody." *Seuss II,* 109 F.3d at 1400 (collecting cases in accord). *But see Mattel,* 353 F.3d at 804 ("We do not require parodic works to take the absolute minimum amount of the copyrighted work possible.")

Northland argues that even if the accused Videos are parodies, Defendants have taken too much of the Northland Video to invoke fair use protection. The CBR Videos use 2 minutes and 2 seconds of the Northland Video's 4 minute and 41 seconds of footage, or 43 percent of the Northland Video. The CBR I Video is slightly under 4 minutes long, and the CBR II Video is approximately 4 minutes and 13 seconds long. Thus, the CBR Videos are between 48 and 53 percent North-

land's original work. The TAG Video is 1 minute and 17 second long, and the entire audio track is taken from the Northland Video–27 percent of the Northland Video's audio track. Northland asserts that Defendants' use is not fair because it is excessive in relation to the total length of the accused Videos, and it plucks from the core of the copyrighted material.

However, there is no "fixed limit" on the amount a parodist may copy. *Fisher,* 794 F.2d at 439. Indeed, " 'substantial copying by a defendant, combined with the fact that the portion copied constituted a substantial part of the defendant's work' does not automatically preclude the fair use defense." *Id.* at 438 (quoting *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 756 (9th Cir.1978)). There are three considerations important to determining whether a taking is excessive under the circumstances. *Fisher,* 794 F.2d at 439. First, courts consider the degree of public recognition of the original work. *Id.* Close copying is impermissible when the work is well-known or familiar to the audience. *Compare Walt Disney Prods.,* 581 F.2d at 756 (close copying of Disney characters impermissible), *with Rycraft, Inc.,* 1999 WL 375610, at *10, 1999 U.S. Dist. LEXIS 6052, at *28 (close copying of cookie stamp sell sheet permitted because it was "essential to plaintiff's comment or criticism"). Second, courts evaluate the "ease of conjuring up the original work in the chosen medium." *Id.* For example, in *Air Pirates,* defendants created a subversive comic book copying Disney characters near-verbatim. 581 F.2d at 757–58. The court found that defendants "took more than was necessary to place firmly in the reader's mind the parodized work and those specific attributes that [were] to be satirized," noting that graphic design was a relatively easy medium for parody. *Id.* The court opined

that other media, such as song or speech, could have more fair use leeway, given the greater difficulty in mimicking that media. *Id.* Third, the court analyzes the focus of the parody, *i.e.* whether the overriding purpose was to parody the original or whether it had another purpose. *Fisher,* 794 F.2d at 439; *see Campbell,* 510 U.S. at 588, 114 S.Ct. 1164.

In this case, the *Fisher* factors militate in favor of Defendants. First, because the Northland Video is not well-known or familiar to the public, Defendants had to use a significant portion of it for the audience to appreciate its parodic nature. Unlike the universally recognizable Disney characters in *Air Pirates,* Defendants needed more than a mere allusion to the Northland Video to effectively parody it. Second, the Northland Video is not easy to conjure up in a sound byte or a single image. While the Ninth Circuit has not specifically opined that video or film is a difficult media to parody, the challenges of parodying video are closer to song or speech than graphic design. Akin to a song or speech, with parody of video there is a "special need for accuracy" that provides some license for a "closer" parody. *Fisher,* 794 F.2d at 439. Just as a would-be parodist loses the likeness of a song if she substantially varies the music or meter of the original, a would-be parodist loses the likeness of a film if he substantially varies the script or setting of the original. It follows that video, like song and speech, should be afforded greater leeway in determining whether a defendant borrowed in excess. Moreover, the Court also considers the difficulty of "conjuring up" the message of a little known video without resorting to use of that video. *See Campbell,* 510 U.S. at 589, 114 S.Ct. 1164. While five seconds might be sufficient to capture the iconic image of Marilyn Monroe in a billowing skirt standing over a vent, the challenge presented in parodying the Northland Video is at the other end of the spectrum.

Third, as discussed *supra* section B.1, the overriding purpose of the accused Videos was to parody the original. While the accused Videos may have commented on the broader abortion debate or may have helped solicit patronage for CBR, these effects were incidental to the primary purpose of parodying Northland's Video. Additionally, the fact that the accused Videos were not a market substitute for the Northland Video weighs in Defendants' favor. Northland likens this case to *Harper & Row,* noting that in both cases the copied material played a "key role in the infringing work." (Pl.'s Mot. Br. 18 (citing 471 U.S. at 566, 105 S.Ct. 2218).) In *Harper & Row,* President Ford contracted with Time Magazine for prepublication excerpts from his memoirs. *Harper & Row,* 471 U.S. at 541, 105 S.Ct. 2218. Before Time published the story, Nation Magazine acquired a copy of the memoir manuscript and "scooped" the story, paraphrasing and copying significant portions at the heart of the memoir. *Id.* The fair use defense was not available because the purpose of the news story was to exploit copyrighted work without licensing it, and the effect on the market was great, given that Nation usurped Time's exclusive and valuable right of first publication. *Id.* at 562–63, 105 S.Ct. 2218; *see also Elvis Presley Enters. v. Passport Video,* 349 F.3d 622, 629 (9th Cir.2003), *overruled on other grounds as stated in AFL Telecomms. LLC v. SurplusEZ.com,* No. CV11–1086–PHX–DGC, 2011 WL 5547855, *2, 2011 U.S. Dist. LEXIS 132055, *5–6 (D.Ariz. Nov. 15, 2011). In contrast, here, Defendants did not usurp the market for the Northland Video, and the accused Videos certainly are not a market substitute. Moreover, unlike Nation Magazine, Defendants did not evade a licensing agreement.

In sum, the purpose of the parody militates in favor of finding fair use.

### 4. Market Harm

■ Under the "market effect" factor, the Court focuses on the extent to which the Defendants' work usurps the potential market for the original or its derivatives. *Campbell,* 510 U.S. at 592, 114 S.Ct. 1164. It is not relevant that a use may damage the original's value through criticism. *Id.* at 591–92, 114 S.Ct. 1164; *Bourne Co. v. Twentieth Century Fox Film Corp.,* 602 F.Supp.2d 499, 510 (S.D.N.Y.2009) ("If a parody of the original work would usurp the market for licensing other comedic uses of the original work, then all parodies would fail under this prong of the analysis."). Courts must distinguish between "biting criticism that merely suppresses demand and copyright infringement, which usurps it." *Campbell,* 510 U.S. at 592, 114 S.Ct. 1164 (quoting *Fisher,* 794 F.2d at 438) (alterations omitted).

■ This analysis requires consideration of more than just the market effect of the particular infringement at issue. Courts are to consider " 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Id.* at 590, 114 S.Ct. 1164 (citation omitted). The burden is on the defendant to "bring forward favorable evidence" that potential markets will not be harmed. *Dr. Seuss II,* 109 F.3d at 1403.

In this case, the harm Northland claims to suffer is not cognizable because it stems from an "aim at garroting the original," not a usurpation of the original's market. *Campbell,* 510 U.S. at 592, 114 S.Ct. 1164. Northland asserts that the accused Videos have diminished the value of the Northland Video and have terminated all conversations with potential licensees. While this is no phantom injury, it is not recognized by the Copyright Act. *Campbell,* 510 U.S. at 591–92, 114 S.Ct. 1164 ("We do not, of course, suggest that a parody may not harm the market at all, but when a lethal parody, like a scathing theater review, kills the demand for the original, it does not produce a harm cognizable under the Copyright Act.") Furthermore, it is unfathomable to think that the accused Videos are a market substitute for the Northland Video. The purposes and messages of the two are diametrically opposite.

In sum, the accused Videos cause no cognizable market harm to the Northland Video. Accordingly, this factor weighs in favor of Defendants.

### 5. Aggregate Assessment

The fair use analysis involves a delicate balancing of the four factors with an eye towards the purposes of copyright. "The doctrine has been said to be 'so flexible as virtually to defy definition.' " *Princeton Univ. Press v. Mich. Document Servs., Inc.,* 99 F.3d 1381, 1392 (6th Cir.1996) (quoting *Time Inc. v. Bernard Geis Assocs.,* 293 F.Supp. 130, 144 (S.D.N.Y.1968)). The case-by-case analysis resists bright-line determinations and the resulting decisions inevitably represent a sort of rough justice.

In this case, the balance of the factors weighs in favor of finding fair use. While the accused works have some commercial use, their transformative character substantially eclipses that consideration. Thus, the first factor tips in favor of Defendants. Because the Northland Video is, at least in part, a creative work, the second factor militates in favor of Northland. The third factor weighs in favor of Defendants because they did not use an excessive amount of the Northland Video to create their parody, in light of the *Fisher* factors. Finally, the fourth factor also weighs in favor of Defendants because the accused Videos did not create a cognizable market injury to the Northland Video.

Though Northland many have suffered pecuniary or reputational losses as a result of the accused Videos, those injuries are not recognized under the Copyright Act. On balance, Defendants' use of the Northland Video was fair.

## C. Vicarious and Contributory Infringement

If a use of copyright is deemed to be fair, the use "is not an infringement of copyright." 17 U.S.C. § 107. Because the Court finds that Defendants' use of the Northland Video was fair, Defendant did not infringe Northland's copyright as a matter of law. Accordingly, the Court need not consider Northland's claim of vicarious or contributory infringement.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED, and Northland's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.